**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Criminal Number:** 1:24-cr-00368-RC |
| | : | |
| | : | |
| **v.** | : | |
| | : | |
| | : | |
| **ALLIEU BADARA KAMARA, JR.,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

## STATEMENT OF OFFENSE IN SUPPORT OF GUILTY PLEA

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, and the Defendant Allieu Badara Kamara, Jr. ("Kamara"), agree and stipulate to the facts presented below. These facts are presented for the purpose of demonstrating that there is factual support for Kamara's guilty plea to Conspiracy to Commit Bank Fraud in violation of 18 U.S.C. § 1349 and Bribery in violation of 18 U.S.C. § 201(b)(1), pursuant to Federal Rule of Criminal Procedure 11, and do not represent all of the evidence known to the parties or that could be presented at trial.

### Background

At all times relevant to this Statement of Offense:

1.      Defendant Allieu Badara Kamara, Jr. was a resident of Maryland and operated several businesses in the District of Columbia that provide services to the District, including Life

Deeds, Inc., ("Life Deeds"),  District Services Management LLC, ("DSM") and Mission Ready, Inc., ("Mission Ready").

2.      Co-Conspirator 1 was a resident of Maryland and was employed as an accountant for several businesses that operated in the District of Columbia and were controlled by Kamara. Kamara and Co-Conspirator 1 were in a romantic relationship throughout the relevant time period.

3.      Co-Conspirator 2 was a resident of Maryland and the owner and operator of Business 1, a beauty services business, that was registered as a Corporation in Maryland on October 10, 2018.  Co-Conspirator 2 was also employed by Government for the District of Columbia and served, during the relevant time period, as a Contract Specialist with the District of Columbia Child and Family Services Agency (CFSA).

4.      CFSA is the public child welfare agency in the District of Columbia responsible for protecting child victims and those at risk of abuse and neglect and assisting their families. Among other things, CFSA provides grants to organizations to, among other things, promote resident and family well-being and improve community safety. As a Contract Specialist with CFSA, Co-Conspirator 2 was responsible for, among other things, drafting the Scope of Work ("SOW") and the Request for Applications ("RFAs") for grants, reviewing grant applications, and, following review of the applications, preparing proposals for the Contracting Officer and the Director of CFSA.

5.      Co-Conspirator 3 was a resident of the District of Columbia and the owner and operator of Business 2, a real estate business, that was registered as a Corporation in Delaware on May 23, 2017, and operated in the District of Columbia.

6.      Life Deeds was a community outreach organization registered as a corporation in the District of Columbia on July 1, 2009.   Life Deeds, provided, among other things, violence intervention services to the government of the District of Columbia.

7.      DSM was a company registered as a corporation in the District of Columbia on October 28, 2015.  DSM provided, among other things, violence intervention services to the government of the District of Columbia.

8.      Mission Ready was a trucking and freight company registered as a corporation in the District of Columbia on January 3, 2018.  Mission Ready provided services to the government of the District of Columbia.

9.      Capital Bank, N.A. ("Capital Bank") was a financial institution insured by the Federal Deposit Insurance Corporation.

### The Small Business Administration

10.      The United States Small Business Administration ("SBA") was an executive branch agency of the United States government that provided support to entrepreneurs and small businesses. The mission of the SBA was to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters.

### The Paycheck Protection Program

11.      The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans suffering the economic effects caused by the COVID-19 pandemic.  One source of relief provided by the CARES Act was the authorization of billions in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as

the Paycheck Protection Program ("PPP").

12.     In order to obtain a PPP loan, a qualifying business must have submitted a PPP loan application, which is signed by an authorized representative of the business.  The applicant of a PPP loan was required to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan.  In the PPP loan application, the applicant must state, among other things, its: (a) average monthly payroll expenses and (b) number of employees.  These figures were used to calculate the amount of money the small business is eligible to receive under the PPP.  In addition, businesses applying for a PPP loan must have provided documentation showing their payroll expenses.  To qualify for eligibility, businesses that applied for a PPP loan needed to be in operation as of February 15, 2020.

13.     A PPP loan application must have been processed by a participating financial institution (the lender).  If a PPP loan application was approved, the participating financial institution funds the PPP loan using its own monies, which are 100% guaranteed by the SBA.  Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, was transmitted by the lender to the SBA in the course of processing the loan.

14.     PPP loan proceeds must have been used by the business for certain permissible expenses—payroll costs, interest on mortgages, rent, and utilities.  The PPP allowed the interest and principal on the PPP loan to be entirely forgiven if the business spends the loan proceeds on these expense items within a designated period of time and uses a certain percentage of the PPP loan proceeds on payroll expenses.

15.     On December 27, 2020, the Economic Aid to Hard-Hit Small Business, Nonprofits and Venues Act provided additional funding for the PPP and extended the application deadline to

March 31, 2021. The act enables borrowers to take a second draw PPP loan under the same general terms as their first PPP loan up to a maximum loan amount of $2 million. The act reopened the program to borrowers who did not previously receive a first draw PPP loan. To be eligible for a second draw, borrowers must have employed no more than 300 employees, demonstrated a 25% reduction in gross receipts during a calendar quarter in 2020, and have expended the full amount of their initial PPP loan. Allowable expenses were expanded to include worker protection costs related to COVID-19, uninsured property damage costs caused by looting or vandalism during 2020, and certain supplier costs and expenses for operations. The expansion applies retroactively to first draw PPP loans that have not been forgiven by the SBA.

16.     On March 25, 2021, the PPP Extension Act of 2021 extended the application deadline from March 31, 2021, to May 31, 2021. In addition to extending the PPP application filing window by 60 days, the Extension Act provided an extra 30 days for the SBA to finish processing applications received by the May 31, 2021, deadline.

### Bank Fraud Conspiracy

17.     Beginning as early as April 8, 2020, through at least August 8, 2022, Kamara, Co-Conspirator 1 and other co-conspirators, including Co-Conspirators 2 and 3, prepared and caused the submission of applications for PPP loans containing materially false and fraudulent information for businesses and business owners who were not eligible to receive PPP funds.

18.     The conspirators prepared and submitted the fraudulent applications to induce Capital Bank and other financial institutions to give them money, and did so to spend the fraudulently obtained money, in part, for their own benefit and enjoyment.

19.     The scheme operated as follows:

a. In spring of 2020, Kamara approached business owners to ask if they wanted to apply, through Kamara, for a PPP loan in the name of their businesses.

b. If the business owner agreed, then Kamara would direct Co-Conspirator 1 to prepare a loan application irrespective of whether the business qualified for a loan and without obtaining the supporting paperwork necessary for the application.

c. Co-Conspirator 1 prepared loan applications containing materially false information, and fabricated supporting paperwork, including fabricated financial and payroll statements.

d. Kamara and Co-Conspirator 1 gave the PPP applications containing the materially false information and fraudulent supporting paperwork to the business owners to file with relevant financial institutions, which they did, including with Capital Bank.

e. If the financial institution disbursed the loan, then the business owners would pay a portion of the fraudulently obtained loan proceeds to Kamara and Co-Conspirator 1.

f. As directed by Kamara, Co-Conspirator 1 helped the business owners prepare materially false and/or fraudulent paperwork to obtain loan forgiveness.

20.     During this time period, at the direction of Kamara, Co-Conspirator 1 prepared and caused the submission of PPP loan applications, containing false and fraudulent statements and fabricated supporting documents, for nine businesses controlled by third parties, and three business under their control, including Life Deeds, Mission Ready, and DSM.  For several of the businesses, multiple applications were submitted for multiple loans.

21.     In total, Kamara and Co-Conspirator 1, submitted and caused the submission of at least 23 false and fraudulent PPP loan applications, resulting in over $3,701,178.95 in unlawful proceeds and the attempted receipt of $1,371,473.36 in unlawful proceeds.   Descriptions of some examples of the false and fraudulent PPP loan applications follow below.

22.     Of that total amount that the conspirators fraudulently obtained, at least $621,700 were transferred to Kamara for his personal benefit.

### Fraudulent PPP Loan – Business 1

23.     In Spring of 2020, Kamara approached Co-Conspirator 2 to ask if she wanted to apply, through Kamara, for a PPP loan in the name of her business, Business 1.  At the time, both Kamara and Co-Conspirator 2 were aware that Business 1 did not qualify for a PPP loan because it did not have any employees or payroll.

24.     Kamara and Co-Conspirator 2 agreed that Kamara would receive a portion of the PPP funds if the loan application was approved and funded.

25.     Kamara directed Co-Conspirator 1 to prepare a fraudulent PPP loan application and fabricate supporting documentation in the name of Business 1.  Co-Conspirator 1 never received any information from Kamara or Co-Conspirator 2 that would be necessary to submit a complete and accurate PPP loan application had Business 1 been eligible for a loan.  However, at the direction of Kamara, Co-Conspirator 1 prepared a PPP loan application containing materially false statements, including that Business 1 had 8 employees and an average monthly payroll of $37,000.00, when in fact as of June 2020, it had no employees or payroll.

26.     In or around June 2020, Kamara provided Co-Conspirator 2 with a PPP loan application containing materially false statements, which was prepared by Co-Conspirator 1.

27.     Kamara and Co-Conspirator 2 agreed that Co-Conspirator 2 would submit the PPP loan application to Capital Bank to seek a loan in the amount of $87,690.

28.     On June 2, 2020, Co-Conspirator 2 submitted the PPP Loan application prepared by Co-Conspirator 1 and given to her by Kamara to Capital Bank to obtain a $87,690.00 PPP loan in the name of Business 1.  In addition, Co-Conspirator 2 submitted to Capital Bank, with her application, supporting documents containing false information that Co-Conspirator 1 prepared and Kamara provided to her.  They included a fabricated financial statement for 2019; false monthly payroll reports from January 2020 through March 2020; and a fabricated Employer's Quarterly Federal Tax Return (Forms 941), for the fourth quarter of 2019 and the first quarter of 2020.

29.     On June 2, 2020, the SBA and Capital Bank approved Co-Conspirator 2's fraudulent application and wired $87,690.00 into a Capital Bank account ending in -6911, held by Business 1.

30.     On January 27, 2021, Co-Conspirator 2 submitted a second fraudulent PPP Loan application, to Capital Bank to obtain a $87,690.00 PPP loan in the name of Business 1.  Like the first application, it was prepared by Co-Conspirator 1 and provided to Co-Conspirator 2 by Kamara.  This second application falsely claimed that Business 1 had 10 employees and an average monthly payroll of $44,390, when in fact, the average monthly payroll was $390.34.

31.     On February 3, 2021, the SBA and Capital Bank approved the second fraudulent PPP loan application and wired $87,690.00 into a Capital Bank account ending in -6911, held by Business 1.

32.     On February 4, 2024, Co-Conspirator 2 wired $87,690 from the Business 1, Capital Bank account ending in -6911 to a SunTrust Bank account ending in in -0841, also held by Business 1.

33.     On February 17, 2021, Co-Conspirator 2 wired $8,500 of the loan proceeds from SunTrust Bank account ending in in -0841 to a Bank of America account ending in -5722, held by Kamara, fulfilling her agreement to pay a portion of the PPP loan to Kamara in exchange for Kamara and Co-Conspirator 1's assistance preparing the fraudulent loan application.

34.     On July 20, 2021, Co-Conspirator 2 submitted to Capital Bank Form 3508S, PPP Loan Forgiveness Application (Form 3508S), on behalf of Business 1, seeking loan forgiveness for her PPP loans.  The Form 3508S was prepared by Co-Conspirator 1 and provided to Co-Conspirator 2 by Kamara.  The application falsely claimed that Business 1 had 10 employees at the time both the first draw loan and related forgiveness applications were submitted to Capital Bank, when in fact it had none.

35.     On March 22, 2022, Co-Conspirator 2 submitted a Form 3508S to Capital Bank on behalf of Business 1 seeking forgiveness for her second PPP loan.  The form was prepared by Co-Conspirator 1 and given to Co-Conspirator 2 by Kamara.  The application falsely claimed that Business 1 had 10 employees at the time Co-Conspirator 2 received the second PPP loan, when in fact it had the average monthly payroll was $390.34.  The application also falsely claimed that, for the period of February 3, 2021, through July 20, 2021, Business 1 spent the full amount of the second draw loan, $87,690.00 on payroll costs.

36.     As a result of the fraudulent Form 3508S submissions, Capital Bank and the SBA forgave both of Business 1's PPP loans.

**Fraudulent PPP Loan – Business 2**

37.     In the summer of 2020, Kamara approached Co-Conspirator 3 to ask if he wanted to apply, with Kamara's assistance, for a PPP loan in the name of Business 2.  At the time, both Kamara and Co-Conspirator 3 were aware that Business 2 did not qualify for a PPP loan because it did not have any employees or payroll.

38.     Kamara and Co-Conspirator 3 agreed that Kamara would receive a portion of the PPP funds if the loan application was approved and funded.

39.     In July 2020, Kamara provided Co-Conspirator 3 with a PPP loan application containing materially false statements, including that Business 2 had 16 employees and an average monthly payroll of $132,547.17, when in fact, as of July 2020, it had no employees and no payroll. In addition, Kamara provided Co-Conspirator 3 false and fraudulent supporting documents to submit with the loan application, including: false financial statements for 2019 and for the first two quarters of 2020, false monthly payroll reports for May 2019 through March 2020, and false Employer's Quarterly Federal Tax Return (Forms 941), for the second, third, and fourth quarters of 2019 and first quarter of 2020.

40.     Co-Conspirator 3 understood that the application and supporting documentation given to him by Kamara had been prepared by Co-Conspirator 1, even though neither Kamara, nor Co-Conspirator 1, requested, or received any information from Co-Conspirator 3 that would be necessary to submit a complete and accurate PPP loan application had Business 2 been eligible for a loan.

41.     Kamara and Co-Conspirator 3 agreed that Co-Conspirator 3 would submit the PPP loan application to Capital Bank to seek a loan in the amount of $331,367.92.

42.     On or about July 10, 2020, Co-Conspirator 3 submitted the PPP Loan application given to him by Kamara to Capital Bank to obtain a $331,367.92 PPP loan in the name of Business 2.  In addition, Co-Conspirator 3 submitted to Capital Bank, with his application, supporting documents he knew to contain false information.

43.     On or about July 22, 2020, as a result of a system failure by Capital Bank, Co-Conspirator 3, through Co-Conspirator 1 and Kamara, resubmitted Business 2's false and fraudulent PPP loan application.

44.     On July 22, 2020, Capital Bank, based on the representations of Co-Conspirator 3, adjusted the loan amount to $304,933.

45.     On July 22, 2020, the SBA and Capital Bank approved Co-Conspirator 3's fraudulent PPP loan application and funded the loan in amount of $304,900.

46.     On July 23, 2020, Co-Conspirator 3 opened a Capital Bank business checking account ending in -0211.

47.     On July 24, 2020, Co-Conspirator 3 electronically signed various loan documents including a Promissory Note and Disbursement Request and Authorization.

48.     On July 29, 2020, the SBA and Capital Bank wired $304,900 into Business 2's Capital Bank account ending in -0211.

49.     On July 29, 2020, Co-Conspirator 3 wired $304,800 from Business 2's Capital Bank account ending in -0211 to a TD Bank account ending in -3426, also held by Business 2.

50.     On August 3, 2020, Co-Conspirator 3 wired $124,000 from Business 2's TD Bank account ending in -3426 to a Truist Bank account ending in -1820, held by a business associated with Kamara.

51.     On June 4, 2021, Co-Conspirator 3 forwarded Kamara an email containing a link to Capital Bank's PPP loan forgiveness application for Business 2.

52.     On June 25, 2021, Co-Conspirator 3 emailed Kamara regarding the status of Business 2's loan forgiveness application.   Kamara responded that Co-Conspirator 1 would complete and submit the application.

53.     On July 20, 2021, Co-Conspirator 3 forwarded an email to Co-Conspirator 1 and Kamara from Capital Bank requesting "a summary paycheck or an FTE [(Full Time Equivalent)] snapshot document from ADP" for the period of January 1, 2020, through October 23, 2020.

54.     On July 20, 2021, at the direction of Kamara, Co-Conspirator 1 prepared false and fraudulent Employer's Quarterly Federal Tax Return (Forms 941) in support of Business 2's PPP loan forgiveness application.

55.     On July 23, 2021, Co-Conspirator 3 submitted a Form 3508EZ to Capital Bank on behalf of Business 2 seeking forgiveness for his PPP loan.   The application falsely claimed that Business 2 had 16 employees at the time Co-Conspirator 3 received the PPP loan, when in fact it had no employees.   The application also falsely claimed that, for the period of July 27, 2020, through October 23, 2020, Business 2 spent the full amount of the second draw loan, $304,900 on payroll costs, when in fact it had no payroll costs.

56.     As a result of the false Form 3508EZ submission and supporting documentation, Capital Bank and the SBA forgave Business 2's PPP loan.

## The Bribery Scheme

57.     Beginning at least as early as January 2019, and continuing through at least December 2023, Kamara engaged in a scheme in which public officials and employees of the District of Columbia, in violation of their lawful and official duties, provided him with confidential

information and directed government contracts and grants to businesses he controlled, including Life Deeds and DSM, in exchange for a percentage of the government contracts he obtained through their unlawful assistance.

58.     For example, beginning as early as January 7, 2019, continuing through at least December 6, 2023, Kamara paid money to Co-Conspirator 2 to induce her to provide Kamara with confidential information about CFSA contracts and grants, in violation of her lawful and official duties.   The confidential information included: (1) the name of other businesses that were submitting bids; and (2) the total amount of competitor bids.  Co-Conspirator 2 and Kamara were aware that this information was not publicly available and only available to Co-Conspirator 2 because of her position as a Contract Specialist with CFSA.  Such information helped to ensure that Kamara's businesses, Life Deeds and DSM, could bid an amount that would increase its chance of being awarded a contract.

59.     As a contract specialist, Co-Conspirator 2 was prohibited, pursuant to by 1800.3 of District of Columbia Personnel Manual – Employee Conduct, from: (1) soliciting or accepting any gift or other item of monetary value from any person or entity seeking official action for, doing business with or conducting activities regulated by employee's agency; (2) using or allowing the use of nonpublic government information to further a private interest; (3) using her public office or position for private gain; and (4) giving preferential treatment to a private organization or individual.  As such, providing the nonpublic government information to Kamara in exchange for monetary compensation was in violation of Co-Conspirator 2's lawful and official duties.

60.     Co-Conspirator 2 also provided Kamara with other assistance even though her job responsibilities did not permit her to do so.  For example, Co-Conspirator 2 advised Kamara to adjust his bid on specific contracts when she knew that the applicant with the lowest bid would

receive the contract; and on one occasion, Co-Conspirator 2 told Kamara to submit a bid with a budget that was below a specific number because she knew that any bid in excess of the number would not receive the contract.

61.    To further ensure that Kamara and his businesses, Life Deeds and DSM, received the contracts and grants, Co-Conspirator 2 would review Kamara's application materials and would advise him to: (1) change various aspects of the proposals to meet the requirements of the RFA even if he could not meet those requirements; and (2) reallocate funds in his proposed budget to reflect a larger amount being used for the community in order to increase the applications appeal to reviewers.

62.    In exchange for the confidential information and unlawful assistance, Kamara and Co-Conspirator 2 agreed that Kamara would pay to Co-Conspirator 2 a percentage of the contract and grant funds received by Life Deeds and DSM.  And Kamara did so.  During the course of the bribery scheme, Kamara and Life Deeds and DSM received at least $2,009,545.45 in contract proceeds and Kamara paid Co-Conspirator 2 at least $233,520.

<div style="margin-left: 40%;">

Respectfully Submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:    *J. Rothstein*

Joshua S. Rothstein
N.Y. Bar No. 4453759
Rebecca G. Ross
N.Y. Bar No. 5590666
John Crabb
N.Y. Bar. No. 2367670
Assistant United States Attorneys
United States Attorney's Office
601 D Street, N.W.
Washington, D.C. 20530
202-252-7164 (Rothstein)

</div>

Joshua.Rothstein@usdoj.gov

DATED: August 7, 2024

## DEFENDANT'S ACCEPTANCE

The preceding statement is a summary, made for the purpose of providing the Court with a factual basis for my guilty plea to the charge against me.  It does not include all of the facts known to me regarding this offense. I make this statement knowingly and voluntarily and because I am, in fact, guilty of the crimes charged.  No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of Offense fully.

I have read every word of this Statement of the Offense.  Pursuant to Federal Rule of Criminal Procedure 11, after consulting with my attorney, I agree and stipulate to this Statement of the Offense, and declare under penalty of perjury that it is true and correct.

Date: 09 Aug 2024

_____
Allieu Badara Kamara, Jr.
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read this Statement of Offense and reviewed it with my client fully.  I concur in my client's desire to adopt and stipulate to this Statement of the Offense as true and accurate.

Date: August 9, 2024

_____
Lloyd Liu
Counsel for Defendant Allieu Badara Kamara, Jr.

16